IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| IN THE MATTER OF:<br><br>HANSEN-MUELLER CO.,<br><br>Debtor(s). | CASE NO. BK25-81226-TLS<br><br>CHAPTER 11 |

ORDER

This matter is before the court on the Limited Motion for Adequate Protection (Fil. No. 199) and the Objection and Challenge to the Final Cash Collateral Order (Fil. Nos. 698 and 720) filed by surety Harco National Insurance Company and International Fidelity Insurance Company.[1] Hearing was held on September 24, 2026. Brian Koenig appeared for the debtor; Shane Mecham appeared for the surety company; James Sullivan appeared for BMO Bank; James Niemeier appeared for Farm Credit Services of America, Farm Credit Services Mid America, and CoBank; and Jacob Schwartz appeared for the Official Committee of Unsecured Creditors.

The surety's objection was filed to obtain some clarity as to its rights, vis-à-vis Hansen-Mueller's pre-petition secured lenders, in funds representing the proceeds collected by Hansen-Mueller when it sold grain purchased from various producers. The surety considers such funds to be held in trust by Hansen-Mueller under the terms of their indemnity agreement – meaning they never became property of the bankruptcy estate – and, because the surety has paid out on the bonds through various state governmental entities which are evaluating and approving or denying producers' claims, the surety believes it is entitled to be made whole from those purported trust funds. In addition, the surety argues Hansen-Mueller executed an absolute assignment of assets under the indemnity agreement, and it also asserts the right to the equitable remedy of subrogation. It filed a claim in the bankruptcy case for $7.9 million.

The surety and the debtor agree that adjudicating the surety's claims is a two-stage process. The threshold issue is whether the surety has rights to any of the grain proceeds, which is a question of law. If it does, then a factual inquiry becomes necessary to determine the amounts the surety is entitled to claim. The parties waived their right to an adversary proceeding at a hearing on August 19, 2026, agreeing instead to submit the legal question of the surety's rights in the proceeds in a

---

[1]International Fidelity Insurance Company was the original issuer of Hansen-Mueller's surety bonds. Subsequently, the surety was changed to Harco National Insurance Company, as evidenced by riders attached to the various bonds issued for Hansen-Mueller's business activities of buying and storing grain. *See* Ex. A to the surety's limited motion for adequate protection (Fil. No. 199). Both companies are owned by IAT Insurance Group. *See* Decl. of Will Pearce at ¶ 3 (Ex. A to the surety's reply brief (Fil. No. 745)). The debtor concedes the identity of the specific company as surety is not necessary for the resolution of this matter.

Throughout, Harco and International Fidelity refer to themselves in the singular, as will the court.

summary format. They filed briefs in support of their legal arguments and made their oral arguments to the court at the hearing on September 24th. The matter is now ready for decision, which will also clear the path for a final hearing on the cash collateral motion.

The surety's objections and motion for adequate protection are denied.

Hansen-Mueller Co. is a grain merchandising and storage company that operated grain elevators across multiple states. It filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code on November 17, 2025. Hansen-Mueller purchased grain under bonded contracts. Producers delivered grain to Hansen-Mueller's facilities in exchange for payment or promised payment. Hansen-Mueller then held the commingled grain in its inventory and eventually sold the grain to third parties under separate contracts that were not bonded and deposited those proceeds into its general operating accounts as required by its secured lenders.

BMO Bank, N.A., and affiliated pre-petition secured lenders hold first-priority perfected liens on substantially all of Hansen-Mueller's assets, subject to certain challenge rights of the official committee of unsecured creditors. Hansen-Mueller has been operating post-petition under a series of cash collateral orders with the caveat that payments to BMO are subject to disgorgement to the extent the court finds it does not have a first lien priority in cash collateral. Under the cash collateral order, BMO is also required to retain $3.9 million in a separate reserve account from which to pay any § 557 grain claimant who is found to have a superior right to grain proceeds previously distributed to pre-petition secured parties. The court ruled earlier on the § 557 claims. That order (Fil. No. 618) and the order denying reclamation claims (Fil. No. 682) rejected all filed § 557 claims to the grain and the grain proceeds, except for those North Dakota claimants whose claims were settled (Fil. No. 733). None of those orders have been appealed, so they are now final.

The surety issued grain dealer and grain warehouse bonds on Hansen-Mueller's behalf in numerous states, with aggregate penal sums of approximately $6.9 million. State licensing agencies require grain dealers and grain storage facilities such as Hansen-Mueller to provide bonds to protect those who sell or store grain by obligating the licensee and/or its surety to comply with federal and state laws and regulations, including "pay[ment] when due for all grain purchased from producers of grain" and "faithful and honest handling of farm products [and] commodities." *See* Ex. A to the surety's limited motion for adequate protection (Fil. No. 199) at 29 and 32, and similar provisions at 2, 25, 26, 67, and 96. As a condition of obtaining those bonds, Hansen-Mueller executed an indemnity agreement with International Fidelity Insurance Company in January 2019 (Fil. No. 199, Ex. B).

The surety's arguments rely on provisions in the indemnity agreement which (1) purport to designate monies due under any contracts covered by the bonds – and the surety gives that phrase an expansive reading – as trust funds, and (2) assign Hansen-Mueller's rights and interests in bonded contracts, money due under such contracts, and other collateral to the surety.

The relevant sections in the indemnity agreement, which identified Hansen-Mueller as the Contractor and International Fidelity Insurance Company and/or Allegheny Casualty Company as the Surety, are:

ASSIGNMENT

FOURTH: The Contractor . . . will assign, transfer and set over, and does hereby assign, transfer and set over to the Surety, as collateral, to secure the obligations in any and all of the paragraphs of this Agreement and any other indebtedness and liabilities of the Contractor to the Surety, whether heretofore or hereafter incurred, the assignment in the case of each bonded contract to become effective as of the date of the bond covering such contract, but only in the event (1) of any abandonment, repudiation, forfeiture or breach of any contracts referred to in the Bonds or of any breach of any said Bonds; or (2) any advice or notification to the Surety that it is unable to perform any contract or obligation without financial assistance from the Surety; or (3) of any breach of the provisions of any of the paragraphs of this Agreement; or (4) of a default in discharging such other indebtedness or liabilities when due; or (5) of any assignment by the Contractor for the benefit of creditors or of the appointment, or of any application for the appointment, of a receiver or trustee for the Contractor whether insolvent or not; or (6) of any proceeding which deprives the Contractor of the use of any of the machinery, equipment, plant, tools or material referred to in section (b) of this paragraph; or (7) of the Contractor's dying, absconding, disappearing, incompetency, being convicted of a felony, or imprisoned if the Contractor be an individual: (a) All the rights of the Contractor in, and growing in any manner out of, all contracts referred to in the Bonds, or in, or growing in any manner out of the Bonds; (b) All the rights, title and interest of the Contractor in and to all machinery, equipment, plant, tools and materials which are now, or may hereafter be, about or upon the site or sites of any and all of the contractual work referred to in the Bonds or elsewhere, including materials purchased for or chargeable to any and all contracts referred to in the bonds, materials which may be in process of construction, in storage elsewhere, in transportation anywhere, or in the process of being manufactured; (c) All the rights, title and interest of the Contractor in and to all subcontracts and/or purchase orders let or to be let in connection with any and all contracts referred to in the Bonds, and in and to all surety bonds supporting such subcontracts; (d) All actions, causes of action, claims and demands whatsoever and the proceeds therefrom which the Contractor may have or acquire against any subcontractor, vendor, laborer or materialman, or any person furnishing or agreeing to furnish or supply labor, material, supplies, machinery, tools or other equipment in connection with or on account of any and all contracts referred to in the Bonds; against any owner, architect, engineer or accountant; and against any surety or sureties of any subcontractor, laborer, or materialman; (e) all claims, causes of actions due, claimed or received on insurance policies, including but not limited to life insurance policies, builders risk policies, fire policies and casualty policies, including premium refunds; (f) any and all rights, title, interest in, or use of any patent, copyright or trade secret which is or may be necessary for the completion of any bonded work; and (g) Any and all percentages retained and any and all sums that may be due or hereafter become due on account of any and all contracts referred to in the Bonds and all other contracts whether bonded or not in which the Contractor has an interest.

> TRUST FUND
>
> FIFTH: The Contractor . . . agrees that all monies due or to become due under any contract or contracts covered by the Bonds are trust funds, whether in the possession of the Contractor or otherwise, for the benefit of persons performing labor or providing materials for projects covered by the Bonds and for payment of all obligations in connection with any such contract or contracts for which the Surety would be liable under any said Bond, which trust funds also inure to the benefit of the Surety for liability or loss it may have or may sustain under any said Bond, and further agrees to use such money for the purpose of performing the contract and discharging the obligations of the Bond and for no other purpose until the Bond is completely exonerated. If the Surety discharges any such obligation, it shall be entitled to assert the claim of such person to the trust funds.

Ex. B to the surety's limited motion for adequate protection (Fil. No. 199).

The surety first argues that the grain proceeds paid to Hansen-Mueller for selling grain it purchased from producers under bonded contracts are not property of the bankruptcy estate under 11 U.S.C. § 541 because Hansen-Mueller was obligated to hold them in trust for the producers under the section quoted above.

As always, contractual interpretation begins with the contract itself. Here, I do not believe the indemnity agreement means what the surety wants it to mean. Perhaps because the indemnity agreement in this case is a form written for the construction industry and is not tailored for the grain merchandising industry, it is difficult to understand how the "trust fund" provision could establish a trust over money Hansen-Mueller received from third parties for the grain. As the debtor's counsel aptly stated, the surety is trying to fit a square peg into a round hole.

The surety's arguments, first, that Hansen-Mueller's business can be analogized to the business of a construction contractor, and second, that the indemnity agreement phrase "all monies due or to become due under any contract or contracts covered by the Bonds" should be read broadly enough to encompass not only purchase contracts Hansen-Mueller entered into with grain producers but also sales contracts with third-party purchasers, simply do not support the surety's request for relief.

Construction contractors bonded for specific projects encompass a different scope of risk than bonds mandated by state and federal licensing requirements for grain dealers to conduct business. Bonds for construction contracts also typically cover a single project with designated funding. There are specific retainage funds to which a surety would have recourse. It just doesn't make sense to say that a grain dealer's bond must cover all the transactions – both buying and selling – that a grain merchant engages in, nor is it practical to so hold. Unlike a construction contract, the payments from third-party buyers are not segregated or earmarked or traceable to a specific project – they are commingled with other funds in the dealer's operating accounts.

The surety bears the burden of showing that a trust exists. *Schaneman v. Wright*, 470 N.W.2d 566, 572 (Neb. 1991) ("[T]he burden of proof is upon one seeking to establish and enforce a trust to prove the same by clear and convincing evidence[.]"

"An express trust is created by a direct, positive, and objectively-manifested act under contract[.] Typically, the parties to an express trust prepare a declaration of a trust, define a trust res and outline specific duties and responsibilities of the trustee." *Aslakson v. Freese (In re Freese)*, 472 B.R. 907, 923 (Bankr. D.N.D. 2012) (cleaned up). A trust requires an existing trust res. *Kully v. Goldman*, 305 N.W.2d 800, 802 (Neb. 1981) ("[N]o trust can be created unless there exists some property interest which may be held by the trustee for the claimant.").

Here, the alleged trust lacks a res. The surety bonds are designed to protect grain producers who sell[2] grain or commodities to Hansen-Mueller, so the contracts covered would be purchase contracts between Hansen-Mueller as the buyer and the producer as the seller. There would be no "monies due or to become due" to Hansen-Mueller under such contracts – because Hansen-Mueller would be the payor – and therefore no funds to which a trust could attach. The surety's attempt to read that provision to fit the present situation stretches the language past its breaking point. Under the indemnity agreement as written, there are no funds to which the surety can claim a legal or equitable interest. Accordingly, any funds Hansen-Mueller received from third parties for selling grain it purchased from unpaid producers are not subject to the "trust fund" provision of the indemnity agreement and are not held in trust.

Alternatively, the surety argues the debtor contractually assigned its interest in bonded contract funds and other collateral to the surety under the terms of the indemnity agreement prior to filing its bankruptcy petition. With this argument, the surety seems to be asserting that the assignment provision of the indemnity agreement creates an absolute assignment of Hansen-Mueller's rights in the grain contracts (and perhaps the grain) rather than an assignment as security. Hansen-Mueller disputes this, arguing the assignment provision merely created an Article 9 security interest in collateral which the surety failed to perfect.

The indemnity agreement's assignment provision, quoted *supra* at 3, plainly states that it is "as collateral, to secure the obligations" to the surety. The indemnity agreement even contains a

[2] The bonds also protect those who contracted with Hansen-Mueller for grain or commodity storage, but such claims are not at issue here.

paragraph[3] describing it as a security agreement under the U.C.C. and providing for filing it as a financing statement, although the surety did not make such a filing.[4]

Under Article 9 of the U.C.C., the term "assignment" generally "includes both an outright transfer of ownership and a contingent transfer for security." *First State Bank Nebraska v. MP Nexlevel, LLC*, 948 N.W.2d 708, 720 (Neb. 2020). The Eighth Circuit Court of Appeals has identified "no meaningful difference between a security interest and an assignment for purposes of security[ and i]n fact, they appear to be the same thing under Article 9." *Artoc Bank & Tr., Ltd. v. Apex Oil Co. (In re Apex Oil Co.)*, 975 F.2d 1365, 1369 (8th Cir. 1992).

"A fundamental purpose of Article 9 is to create commercial certainty and predictability by allowing [creditors] to rely on the specific perfection and priority rules that govern collateral within the scope of Article 9." *Boatmen's Nat'l Bank of St. Louis v. Sears, Roebuck & Co.*, 106

---

[3] UNIFORM COMMERCIAL CODE

> SIXTH: This Agreement shall constitute a Security Agreement to the Surety and also a Financing Statement, both in accordance with the provisions of the Uniform Commercial Code of every jurisdiction wherein such Code is in effect and may be so used by the Surety without in any way abrogating, restricting or limiting the rights of the Surety under this Agreement or under law, or in equity. A carbon, photographic or other reproduction of this Agreement may be filed as a Financing Statement.
>
> The Surety may make such additions to this Agreement as may be necessary or desirable to permit its filing as a Financing Statement under the Code.
>
> This Security Agreement and Financing Statement shall secure payments made, and to be made, by the Surety hereunder and under the Bonds issued by the Surety that are not reimbursed to the Surety by the Contractor or Indemnitors and shall cover and attach to the following collateral: all tangible or intangible personal property and fixtures owned by the Contractor and Indemnitors, wherever located or situated and whether now owned or hereafter acquired, including the personal property described in Paragraph Fourth, and shall cover proceeds from sale of covered property.

Ex. B to the surety's limited motion for adequate protection (Fil. No. 199).

[4] Despite this, the surety argues it does not need to abide by the requirements of the Uniform Commercial Code because it is not a secured lender. It argues that as a surety, it has different obligations from a lender and its claim is based in equity. *See Transamerica Ins. Co. v. Barnett Bank of Marion Cnty., N.A.*, 540 So. 2d 113 (Fla. 1989) and *Mickelson v. Aetna Cas. & Sur. Co. (In re J.V. Gleason Co.)*, 452 F.2d 1219 (8th Cir. 1971). However, that line of cases finds that a surety's subrogation rights are not subject to U.C.C. filing requirements – they do not completely exempt surety companies from compliance with the U.C.C. when they are asserting a contractual security interest.

F.3d 227, 230–31 (8th Cir. 1997) (cleaned up). Therefore, as an Article 9 security interest, the surety's assignment would need to be perfected – whether by a U.C.C. filing or possession or control, depending on the type of collateral – in order for the surety to assert priority over third parties. That did not happen here. Accordingly, the surety holds no more than an unperfected security interest that is subordinate to BMO's perfected security interest.

Even if the surety's security interest were perfected, the assigned assets do not give the surety what it desires. Under the assignment provision, the surety must first show that Hansen-Mueller defaulted or breached a bond or any bonded contracts. Assuming for purposes of this analysis that the debtor won't disagree that such a breach or default has occurred, the assignment to the surety includes:

> (a) All the rights of the Contractor in, and growing in any manner out of, all contracts referred to in the Bonds, or in, or growing in any manner out of the Bonds; (b) All the rights, title and interest of the Contractor in and to all machinery, equipment, plant, tools and materials which are now, or may hereafter be, about or upon the site or sites of any and all of the contractual work referred to in the Bonds or elsewhere, including materials purchased for or chargeable to any and all contracts referred to in the bonds, materials which may be in process of construction, in storage elsewhere, in transportation anywhere, or in the process of being manufactured; (c) All the rights, title and interest of the Contractor in and to all subcontracts and/or purchase orders let or to be let in connection with any and all contracts referred to in the Bonds, and in and to all surety bonds supporting such subcontracts; . . . and (g) Any and all percentages retained and any and all sums that may be due or hereafter become due on account of any and all contracts referred to in the Bonds and all other contracts whether bonded or not in which the Contractor has an interest.

Ex. B to the surety's limited motion for adequate protection (Fil. No. 199).

To be clear, the rights and interests referred to in that section all derive from the *bonded contracts*. The proceeds in which the surety claims an interest derive from separate, unrelated contracts between Hansen-Mueller and third-party buyers; they are not covered by the assignment. Accordingly, any funds Hansen-Mueller received from third parties for selling grain it purchased from unpaid producers are not subject to the "assignment" provision of the indemnity agreement and were not assigned to the surety.

Aside from its assertion of rights under the indemnity agreement, the surety also invokes its subrogation rights. It makes a two-pronged argument here, asserting that it stands in the shoes of the unpaid grain producers *and* in the shoes of the debtor.

"The right of subrogation is established 'where a party is compelled to pay the debt of a third person to protect his own rights or interest.'" *Pennsylvania Ins. Co. v. Fed. Express Corp.*, No. 25-1777, 2026 WL 2607468, at *6 (8th Cir. Sept. 3, 2026) (quoting *Cagle, Inc. v. Sammons*, 198 Neb. 595, 254 N.W.2d 398, 403 (1977)). "Nowhere is subrogation more appropriate or common than in the context of suretyship." *In re Alcon Demolition, Inc.*, 204 B.R. 440, 446 (Bankr.

D.N.J. 1997). "Indeed, the Supreme Court has noted that 'there are few doctrines better established than that a surety who pays the debt of another is entitled to all the rights of the person he paid to enforce his right to be reimbursed.'" *Id.* (quoting *Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 136–37 (1962)).

A surety claiming subrogation rights on behalf of more than one party is not unusual. *Alcon Demolition* observed that construction sureties who complete a project and pay subcontractors can "step into three sets of shoes" – the contractor to the extent receivables are due, the suppliers and laborers whom the surety paid, and the project owner. 204 B.R. at 447 (quoting *Nat'l Shawmut Bank of Boston v. New Amsterdam Cas. Co.*, 411 F.2d 843, 845 (1st Cir. 1969)).

As to the grain producers, the debtor argues the surety cannot exercise its subrogation rights because the bond amounts paid are less than the amount of the claims held by the producers, so the producers will never be paid in full, thereby preventing the surety from stepping into their shoes to recover from the debtor. The surety points out that it has obtained releases from producers accepting a reduced sum in full settlement of their claims against the bonds and assigning to the surety their rights to recover against the debtor up to the amount of the settlement. *See* Ex. A to the surety's reply brief (Fil. No. 745).

Nevertheless, those liability releases and subrogation rights do not improve the surety's overall position. The grain producers into whose shoes the surety is stepping are unsecured creditors. This court has not awarded any producers a right to the grain or its proceeds. In fact, previous orders – which are now final – found that the producers did not retain any interest in the grain or its proceeds. *See* Fil. Nos. 618, and 682. Therefore, the producers whose § 557 claims were denied and the producers who did not file § 557 claims hold general unsecured claims. *Am. Nat. Bank v. Clark*, 670 N.W.2d 484, 487 (Neb. Ct. App. 2003) ("Subrogation is the substitution of another person in the place of a creditor . . , but such subrogee can acquire no greater right than the creditor had to whose right he succeeds at the time of such payment by him[.]") (quoting *Am. Sur. Co. v. Sch. Dist. No. 64*, 219 N.W. 583, 588 (Neb. 1928)).

As to the argument that the surety also steps into the shoes of the debtor, the surety uses the analogy of a builder under a construction contract who has the right to collect funds due from the project owner. The surety argues that when it steps into the builder's shoes, a relation-back doctrine is triggered – in other words, once the surety suffers a loss, its equitable subrogation rights relate back to the date of the bond. In the bankruptcy context, the surety asserts the relation-back means the proceeds from selling the grain never became property of Hansen-Mueller's bankruptcy estate.

That argument perhaps may work in a construction context, but it is inapplicable here. Bonded construction contracts are unquestionably different than bonded grain purchase contracts. In the construction context, the surety often steps in for the bonded general contractor and pays the subcontractors who were not paid by the general contractor. Then the surety finishes construction and is entitled to the remaining contract payments from the owner. As *Alcon Demolition* noted, such contracts have identifiable proceeds, and it's easy to declare that an equitable lien in favor of the surety exists in such proceeds. Here, the debtor simply bought grain

and didn't pay for it. The grain became Hansen-Mueller's inventory and BMO's collateral. There were no identifiable proceeds or earmarked contract funds available to be paid out to producers.

Accordingly, since the threshold legal question – whether the surety has rights to any of the grain proceeds – has been answered in the negative, there is no need to engage in further factual inquiries to trace grain proceeds. Also, there is no further need for BMO to continue to retain $3.9 million of grain proceeds in a separate reserve account.

IT IS ORDERED: The Limited Motion for Adequate Protection (Fil. No. 199) filed by surety Harco National Insurance Company and International Fidelity Insurance Company is denied. The Objection and Challenge to the Final Cash Collateral Order (Fil. Nos. 698 and 720) filed by surety Harco National Insurance Company and International Fidelity Insurance Company are denied.

DATED: September 28, 2026

BY THE COURT:

/s/ Thomas L. Saladino
United States Bankruptcy Judge

Notice given by the court to:

| | |
|---|---|
| Brian Koenig | Jacob Schwartz |
| *Shane Mecham | James Sullivan |
| James Niemeier | United States Trustee |

Movant (*) is responsible for giving notice to other parties if required by rule or statute.